**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

E.S., by and through her parents
KEVIN AND PAMELA STEINMETZ,
and R.G., by and through her parents
AMANDA AND BLAKE GRAY,

        *Plaintiffs*,

v.

        Case No. 26-4032-AJP-ADM

MANHATTAN-OGDEN UNIFIED
SCHOOL DISTRICT 383,

        *Defendant*.

**MEMORANDUM AND ORDER**

Plaintiffs E.S. and R.G., by and through their parents, guardians, and next friends, filed suit against Defendant Manhattan-Ogden Unified Schools ("the District") for its alleged failure to accommodate E.S. and R.G.'s disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("the ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("the Rehabilitation Act"). Before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. 10). They seek to enjoin the District from enforcing its policy that prohibits students from receiving Applied Behavior Analysis ("ABA") therapy at school. For the reasons stated below, the Court finds that Plaintiffs are likely to

succeed on the merits and that the equities and public interest favor granting the preliminary injunction. Thus, the Court grants the preliminary injunction.

## I.    Factual and Procedural Background

Plaintiffs E.S. and R.G. are children who have been diagnosed with autism. E.S. was diagnosed in March 2022, and R.G. was diagnosed in October 2017. Their autism causes both children to experience significant changes in daily life including difficulty with verbal expression, language comprehension, emotional regulation, peer interaction, and focus. Consequently, major life activities including learning, communicating, and caring for themselves are severely limited. E.S. is also prone to giving spontaneous hugs, and she has detrimental behaviors such as elopement and pica. R.G. has detrimental behaviors including elopement and fears of bathrooms and entering buildings. She also struggles with daily life tasks, and she is substantially behind academically.

To treat their autism, both children were prescribed ABA therapy by their respective doctors, and both were told the therapy should be used across multiple settings, including school. ABA therapy is administered pursuant to individualized treatment plans designed and implemented by a Board-Certified Behavior Analyst ("BCBA"). ABA therapy in the classroom helps students with autism make measurable gains because children must learn skills in the environment in which they are expected to use them. ABA therapy in the classroom makes education accessible for children with autism by allowing educational and medical needs to be

addressed simultaneously in the natural environment, but it does not replace education. The cost of E.S. and R.G.'s ABA therapy is covered by private insurance.

E.S. attended Theodore Roosevelt Elementary School as a kindergartner, and R.G. attended Oliver Brown Elementary School as a fifth grader during the 2024-2025 school year. The District permitted them to receive ABA therapy at school during this school year, but the permission was on a school-by-school basis. The ABA therapy occurred during normal classes and special education sessions. The teachers and principals were supportive and reported that the therapist's presence was helpful and did not interfere with learning activities. Both E.S. and R.G. made significant developmental gains in their abilities to communicate, focus, and social skills. They also developed meaningful relationships with their peers and showed marked improvements in all areas.

During the summer of 2025, the District enacted a policy ("Policy KM") prohibiting ABA therapy in all classrooms. According to the Assistant Superintendent for the District, Nathan Downs, the District determined that it needed a district-wide policy regarding outside third parties due to liability concerns. The District's insurance carrier informed the District it needed indemnity agreements between it, the parents of students receiving ABA therapy, and the ABA company to allow ABA providers to work on the District's premises while maintaining insurance coverage.

The District noted several concerns that led to Policy KM, including an inability to supervise or control non-district personnel creating safety and

compliance risks, the feasibility of suppling ABA therapists to the approximately 1000 students that receive accommodations in the District, the likelihood of setting a precedent that ABA therapy is a required accommodation creating substantial financial obligations, and the heightened liability from the District's insurance refusing to cover non-district personnel.

After the ban was enacted, the District provided a proposed memorandum of understanding ("MOU") to Plaintiffs' ABA provider agency, Ad Astra MHK, LLC ("Ad Astra"), that would allow the ABA therapists limited access to the District's premises. The MOU required that personnel providing the services undergo a criminal background check, $5,000,000 liability and worker's compensation insurance provided by Ad Astra, and Ad Astra's agreement to indemnify the District for any losses caused by the therapists' presence.

Ad Astra declined. Ad Astra's CEO, Julie Moore, explained that prior to the new policy, the District had never identified any operation or administrative burdens associated with allowing the therapists in the classroom. Only background checks of each therapist, TB tests, and signed Observer Confidentiality Forms were required to provide services in the classroom. There were no other contract or insurance requirements. Ad Astra refused to sign the MOU because it only allowed ABA therapists access to school premises, not the classroom, and it required liability insurance in excess of the industry standard $1,000,000 coverage. Because the District would not let ABA therapists in the classroom, where the benefit from therapy is received, Ad Astra did not attempt to resolve the other issues with the

-4-

MOU. However, Moore believed they could have been resolved had the District been more reasonable. Moore also explained that the District's conditions are outside the norm compared to other public school districts in Kansas that have been allowing ABA therapists in the classroom without the proposed conditions or restrictions for up to the past 15 years.

Following the enactment of Policy KM, Plaintiffs submitted ADA accommodation requests to the District accompanied by documentation of the medical necessity. Plaintiffs allege that the District denied each request without explanation and failed to engage Plaintiffs in the interactive process.

Consequently, E.S. left the District to attend a parochial school, which cut-off E.S. from her neighborhood peer group in which she formed relationships. R.G. also left the District and is now homeschooled. She too has lost her peer relationships and social progress. These actions have imposed a financial burden on Plaintiffs, as R.G.'s mother has lost her income due to her homeschooling R.G., plus Plaintiffs have incurred the costs for parochial school and school materials. Both children have experienced regression in the progress they had made, and their specialists believe both will suffer long-term harm from the lack of access to public school. While both students still had access to the District's special education services, the District did not allow the ABA therapists in the classroom, so the special education teachers have had to focus on addressing E.S. and R.G's adverse behaviors instead of teaching. Now, E.S. and R.G. are deprived of the quality of special education services they were previously receiving.

Plaintiffs filed their complaint on April 2, 2026, wherein they requested a preliminary injunction. (Doc. 1). They then filed a Motion for Preliminary Injunction on May 20, 2026, asking this Court to enjoin the District from enforcing its policy prohibiting ABA therapy and return the parties to the status quo while the case proceeds. (Doc. 10/11). A hearing on the motion was held on July 28, 2026, wherein the parties presented oral argument.

## II.    Legal Standard

A preliminary injunction is an extraordinary remedy, and a court will not grant one as a matter of right. *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted). An injunction "may only be awarded upon a clear showing the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). Thus, a preliminary injunction simply "preserve[s] the status quo pending the outcome of the case." *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).

The legal standard for a preliminary injunction is well-established. The moving party must demonstrate that "(1) it is substantially likely to succeed on the merits, (2) it will suffer irreparable injury if the injunction is denied, (3) its threatened injury outweighs the injury the opposing party will suffer under the

injunction, and (4) the injunction would not be adverse to the public interest." *State v. United States Env'l Protection Agency*, 989 F.3d 874, 883 (10th Cir. 2021) (internal quotation marks and citation omitted).

### III.   Analysis

### A.   Likelihood of Success on the Merits

The purpose of a preliminary injunction is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit. *Coalition of Concerned Citizens v. Fed. Transit Admin. Of U.S. Dep't of Transp.*, 843 F.3d 886, 901 (2016). Thus, the plaintiff must "present a prima facie case but need not show a certainty of winning." *Id.*

Plaintiffs' complaint alleges claims under Title II of the ADA and Section 504 of the Rehabilitation Act. To establish a prima facie discrimination claim under Title II of the ADA, Plaintiffs must demonstrate that: (1) they are qualified individuals with a disability; (2) they were either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability. *See* 42 U.S.C. § 12132; *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). Similarly, to establish a prima facie discrimination claim under Section 504 of the Rehabilitation Act, Plaintiffs must demonstrate that: (1) they are handicapped individuals under the statute, (2) they are otherwise qualified for the benefit sought, (3) they were discriminated against solely by reason of their handicap, and (4) the program or activity in question receives federal financial

assistance. *Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011). Because the statutes "involve the same substantive standards," claims brought under both the ADA and the Rehabilitation Act are analyzed together. *Miller v. Bd. Of Educ.*, 565 F.3d 1232, 1245 (10th Cir. 2009); *see also Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790, 806 (10th Cir. 2025) (addressing the claims together).

The parties do not dispute that the District is a "public entity" under the ADA, *see* 42 U.S.C. § 12131(1), that its operations are a "program or activity receiving Federal financial assistance" under the Rehabilitation Act, *see* 29 U.S.C. § 794, or that E.S. and R.G. are qualified individuals with a disability. Therefore, Plaintiffs' success is dependent upon whether E.S. and R.G. were denied the benefit of a public education because of their disability.

Here, Plaintiffs assert the District denied them meaningful access to the District's services when it created a blanket prohibition on ABA therapists in the classroom despite E.S. and R.G.'s doctors finding such treatment to be medically necessary for their autism. Plaintiffs further contend the District then failed to accommodate E.S. and R.G. upon request.

To effectuate the meaningful access mandate, "[a] public entity must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and requires an accommodation of some kind to participate in or receive

the benefits of its services."[1] *J.V. ex rel. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1299 (10th Cir. 2016). A public entity is on notice when the need is obvious or the individual requests an accommodation. *Id.* But a public entity is not required to take any action if it can demonstrate the requested accommodation would result in a "fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Robertson*, 500 F.3d at 1196; 28 C.F.R. § 35.164.

Therefore, Plaintiffs have the burden of proving the elements required for a statutory claim, and the District has the burden of proving undue burden or fundamental alteration in the nature of its service or program.

Clearly, the District knew E.S. and R.G. needed an accommodation. Not only did E.S. and R.G. both submit ADA accommodation requests to the District after Policy KM was implemented, but the District knew of E.S. and R.G.'s medical need for ABA therapy and accommodated it for a year before implementing the policy.

To demonstrate that they were denied meaningful access to the District's education services, Plaintiffs presented affidavits from E.S. and R.G.'s ABA therapists explaining the purpose of ABA therapy in the classroom and how it has impacted E.S. and R.G.'s education and development. The purpose of ABA therapy is to work with autistic children in their natural environments to address their adverse behaviors as they arise and develop the skills they are expected to use in

---

[1] The ADA's use of "reasonable modification" is essentially equivalent to the Rehabilitation Act's use of "reasonable accommodation." *Robertson*, 500 F.3d at 1195 n.8.

those environments. ABA therapy is not a substitute for education. Instead, it ensures that autistic children can focus, understand, and participate in the classroom environment. ABA therapy in the classroom is used to develop skills such as sustained attention, independently completing routines, emotional regulation, functional communication, and flexibility in transitions and unexpected changes to curb the maladaptive behaviors that hinder an autistic student's ability to learn. Without the ABA therapist's presence, the teacher must address the autistic children's adverse behaviors instead of focusing on the curriculum.

Since both children were removed from the District to receive an education that allows ABA therapists in the classroom, they have been receiving special education services from the District, but their ABA therapists have been prohibited from being in the classroom. Plaintiffs' allege that this has decreased the quality of the special education services E.S. and R.G. receive, and their regression demonstrates how they are being denied meaningful access to education services when their ABA therapists are not in the classroom.

The District raises two defenses. First, the District argues it did not withhold any services from Plaintiffs. Second, it contends that Plaintiffs' requested accommodation is not reasonable because it would fundamentally alter the nature of the service provided.[2]

---

[2] The District raises an undue burden argument when claiming the hardships favor denying the injunction. (Doc. 18 at 8). The District, however, did not raise that point when arguing Plaintiffs would not prevail on the merits, nor did it support the argument with any caselaw. In fact, the District did not distinguish between the evidence for undue burden and the evidence for fundamental alteration. Therefore, the Court does not address the merits of this defense separately from the District's fundamental alteration in the nature of its services defense.

The District's first argument stems from Plaintiffs decision to remove E.S. and R.G. from the District to receive education that would allow the ABA therapists in the classroom. The District's argument, however, misses the purpose of reasonable accommodation claims which is to have meaningful access, not just access to services. Meaningful access to education requires being able to attend in a substantive sense with an equal opportunity to participate. Thus, Plaintiffs are substantially likely to demonstrate a need for a reasonable accommodation to address E.S. and R.G.'s autism in the classroom because their autism hinders their ability to engage educationally and socially in the classroom.

The District next contends that Plaintiffs claims will not succeed on the merits because their requested accommodation fundamentally alters the District's services. Unfortunately, the Tenth Circuit has not addressed the question of whether requiring ABA therapists in the classroom as an accommodation for autism is reasonable. There is, however, an analogous case from the District of New Jersey that supports Plaintiffs' claims.

In *K.N. v. Gloucester City Board of Education*, 379 F. Supp. 3d 334 (D.N.J. 2019), an autistic child's parents requested a one-on-one aide as an accommodation for an after-school program. The court found that an accommodation was needed because the child's autism prevented him from substantively attending and participating in the program. *Id.* at 352. It held that a one-on-one aide was a reasonable accommodation because the combination of the aide plus the special education teacher was the only demonstrated way to maintain the child and "confer

a benefit on [him] that is available to his non-disabled peers." *Id.* at 354. Without the one-on-one aide, his behavioral issues persisted and would often lead to him being picked up early. *Id.* at 353. The court also found that the one-on-one aide did not fundamentally alter the program because the school had provided the accommodation in the past without any indication of fundamental alteration. *Id.* at 351.

The same is true here. With autism, the accommodation must maintain the child's behaviors to an extent that allows them to receive an equal opportunity to participate in the class. E.S. and R.G.'s autism inhibits their abilities to communicate, focus, and regulate their emotions. Plaintiffs have presented evidence that E.S. and R.G. were progressing in their education and skill development when ABA therapy was allowed in the classroom. They have also presented evidence that the removal of ABA therapy from the special education services was detrimental to their ability to participate. It would follow that the same outcome would occur if they were attending the public schools without ABA therapy. Therefore, Plaintiffs present a strong case that ADA therapy in the classroom is a reasonable accommodation.

To avoid having to allow this accommodation, the District must establish that the accommodation fundamentally alters its service. A fundamental alteration typically negates a purpose of the service such as rendering a student an observer rather than a participant, *see Southeastern Community College v. Davis*, 442 U.S. 397, 404 (1979); *McCulley v. University of Kansas School of Medicine*, 591 Fed.

App'x 648 (10th Cir. 2014), or modifying the academic standards, *see Dixon v. Board of Trustees of the Metropolitan State University of Denver Colorado*, 2025 WL 4701458, at *16–17 (Feb. 24, 2025); *Gati v. Western Kentucky University*, 762 Fed. App'x 246, 249 (6th Cir. 2019).

The District argues the fundamental alterations will be risks to security and privacy in the classrooms, additional liability for the District, lack of control over the ABA therapists, and "a variety of possibilities that are not currently imaginable." (Doc. 18 at 13). The District's claims strike the Court as speculative and not supported by caselaw.

The District's complaint that the Plaintiffs' requested accommodation fundamentally alters their service primarily fails because it has offered this accommodation to E.S. and R.G. in the past without any documented issues or fundamental alterations to the District's services. In fact, the teachers and principals have commented on how helpful ABA therapists are. Because ABA therapy in the classroom helps achieve the purpose of educating and engaging with the students, and because the District's claimed harms appear speculative at best, it is unlikely the District can mount a successful fundamental alteration argument.

Thus, Plaintiffs have demonstrated a high likelihood of success on the merits because they have demonstrated that E.S. and R.G. cannot fully participate in the classroom without the aide of their ABA therapists, the District was aware of the need for an accommodation, and providing Plaintiffs' requested accommodation is not likely to fundamentally alter the nature of the District's services.

**B.      Irreparable Harm**

To justify the issuance of a preliminary injunction,  Plaintiffs must also show that they will suffer irreparable harm if the injunction is denied. To satisfy this element, Plaintiffs must demonstrate a significant risk that they "will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

Plaintiffs argue that without the injunction E.S. and R.G. will suffer from behavioral regression rendering them unable to make meaningful progress in their education. A variety of courts have found irreparable harm where a student's education is interrupted or lacks meaningful progress. *See Bd. of Educ. of Rio Rancho Pub. Sch. v. Coleman ex rel. Coleman*, 2007 WL 9734070 at *7 (D.N.M. June 27, 2007) (finding irreparable harm where student would be deprived of supplemental therapy to treat her down syndrome in school); *N.D. v. Reykdal*, 102 F.4th 982, 994–95 (9th Cir. 2024) (finding irreparable harm where plaintiff demonstrated regression after loss of special education services); *N.D. ex rel. Parents Acting As Guardians Ad Litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1112–13 (9th Cir. 2010) (finding irreparable harm where plaintiff demonstrated behavior regression after denial of special education); *C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 444 (E.D. Pa. 2021) (finding irreparable harm where plaintiff cannot make meaningful progress using alternative methods of education).

Plaintiffs have demonstrated that E.S. and R.G. have regressed despite exploring alternative education options. Before Policy KM, E.S.'s detrimental

behaviors such as elopement and pica substantially decreased in frequency and intensity and she was learning how to communicate and manage her emotions, allowing her to improve educationally. Following the enactment of Policy KM, E.S. enrolled in a parochial school so she could continue to receive ABA therapy and special education services, but the District prohibited the ABA therapist from being in the classroom during the special education services decreasing their effectiveness. Her ABA therapist, Anna Nippert, noted that E.S. is now deprived of special education services and the peer relationships she had formed which is detrimental to her education and social development and "has the potential for long-term quality of life problems." (Doc. 11-4 ¶¶ 7, 9–10).

R.G. also progressed due to receiving ABA therapy in the classroom. Her phobias, elopement, and social and emotional skills greatly improved. Since Policy KM was implemented, R.G. has been homeschooled so she can continue to receive her ABA therapy. But now, she is deprived of social interactions with her peers and meaningful special education services. Consequently, she has experienced developmental and social regression. Her skin picking, phobias, and avoidance behaviors have returned. R.G.'s therapist has opined that the current disruption to R.G.'s education could have "life long detrimental consequences." (Doc. 11-5 ¶ 13).

The ongoing and likely future harm to E.S. and R.G.'s development and education cannot be compensated monetarily. Plaintiffs have demonstrated they will suffer irreparable harm if their education is to proceed without ABA therapy.

In response to these documented harms, the District argues that Plaintiffs' harm is self-inflicted, thus prohibiting them from satisfying the irreparable harm requirement. The District claims that Plaintiffs chose to remove E.S. and R.G. from the school because they disagreed with Policy KM and selected the children's current educational placements themselves. Downs, the Assistant Superintendent of the District, explained that E.S. and R.G. could have returned to school with ABA therapy if their therapy provider agreed to the MOU.

Problematic for the District is the fact that while the Tenth Circuit has recognized that irreparable harm cannot be self-inflicted, self-inflicted harm only "results from either misconduct or something akin to entering a freely negotiated contractual agreement, not from a failure to comply with an allegedly unlawful regime." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016).

The irreparable harm suffered by Plaintiffs is not self-inflicted because the District's policy forced Plaintiffs to choose between two options, both of which would have caused irreparable harm to the children's education and denied them meaningful access to their education. And agreeing to the MOU would not have provided Plaintiffs with ABA therapy in the classroom, so the harm would have still have occurred.

Moreover, the District's assurances that it was willing to work with Plaintiffs and allow the children to return to the school are unconvincing. Plaintiffs report that they made ADA accommodation requests with supporting documentation explaining the medical necessity, but such requests were denied without

-16-

explanation. They also allege that any attempts to communicate with the District to reach a resolution went unanswered. The lack of communication and cooperation forced Plaintiffs to file their complaint in April 2026 after waiting for the District to respond to requests made in September and December 2025. And when the District told Ad Astra it's insurance required an indemnity agreement to allow Ad Astra on school grounds, the District's insurance carrier never presented Ad Astra with an indemnity agreement.

Plaintiffs have demonstrated irreparable harm from the continued regression in their education and development if a preliminary injunction is not granted. This harm was not self-inflicted because the District forced Plaintiffs to choose between public education and ABA therapy and it did not collaborate with Plaintiffs to address their concerns.

## C.    Balancing the Hardships

"To be entitled to a preliminary injunction, the movant has the burden of showing that the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks and citation omitted).

Plaintiffs have alleged lifelong harm to E.S. and R.G. stemming from a regression in the progress they have made, delayed development of their life and social skills, and lack of meaningful progress in their education during critical years of their educational development. E.S. and R.G.'s development in their life and social skills and education was progressing satisfactorily before Policy KM was

implemented. And E.S. and R.G.'s regression since the implementation of Policy KM raises serious concerns for their wellbeing going forward. These hardships will be alleviated by enjoining the District from enforcing Policy KM against E.S. and R.G. and returning them to the educational environment they enjoyed before.

In contrast to the real and ongoing harm to E.S. and R.G., the District's claimed hardships are unconvincing because they are speculative, unsupported, or were previously tolerated by the District. *See Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220–21 (10th Cir. 2003) (finding hardships favored an injunction where the Transit Authority's hardships from accommodating mobility issues had been tolerated for years and the severity of their efficiency concerns were undocumented); *Heideman*, 348 F.3d at 1191 (finding a "less than substantial" claim for hardship where the city offered no specific evidence that the prohibition would produce significant improvement with respect to the negative secondary effects, the city tolerated the now prohibited behavior for many years, and the city took over a year to implement the policy negating a need for "immediate implementation"); *Adams ex rel. Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996) (finding minimal hardship to the defendant where the complained of problems were previously overcome by the school without major difficulties and the court believed the school capable of finding solutions to problems as they arose during the school year).

Despite the District's claim that Plaintiffs hardships can be lessened by merely returning to the District where they can receive higher quality special

education services, Plaintiffs' affidavits support their position that they face a Hobson's Choice—giving E.S. and R.G. their prescribed therapy or receiving special education services. But as the children's therapists explained, the effectiveness of E.S. and R.G.'s education is contingent upon the teachers, special education providers, and ABA therapists working together because ABA therapy is not a substitute for education—it makes it accessible. Even if Plaintiffs' hardships could be lessened by returning to the District without ABA therapy, there is no indication that E.S. and R.G.'s development would begin progressing again. Therefore, Plaintiffs are still facing educational and developmental hardships.

The District is rightly concerned with the privacy and security of other students in the classroom; however, E.S. and R.G.'s therapists were in the classroom for a year without any documented incidents related to other students' privacy or security. Moreover, to address valid privacy and security concerns, the Ad Astra therapists routinely sign a confidentiality agreement, go through a background check, and are tested for TB before being in the classroom. Lastly, the District allows other third parties in the classroom such as parents, volunteers, and university students without compromising the privacy and security of other students.

Finally, the District claims a financial hardship from the increased liability risk of having non-district employees in the classroom. Although valid on its face, the District offered no documented incidents to substantiate their concerns about liability risks. Ad Astra is insured to the industry standard, and the District has

accepted this liability risk in the past. The District also worries about the possible

financial and logistical hardships from having to provide ABA therapists to

students. Such worries are unfounded. The Plaintiffs have not asked the District to

provide for the ABA therapy, and an injunction would be limited to allowing E.S.

and R.G. to pay for their own therapists.

A preliminary injunction requiring the District to allow ABA therapists into

E.S. and R.G.'s classrooms, paid for by the Plaintiffs, with privacy and safety

conditions, will have minimal impact on the District but will greatly promote, as it

has in the past, Plaintiffs' education and development. Thus, the balance of harms

favor granting the injunction.

**D.     Public Interest**

For the fourth and final element necessary to justify a preliminary

injunction, "[a] movant also has the burden of demonstrating that the injunction, if

issued, is not adverse to the public interest." *Heideman*, 348 F.3d at 1191.

Plaintiffs argue their requested injunction serves the strong public interest in

enforcing anti-discrimination provisions of the federal statutes and ensuring

students with disabilities receive a meaningful public education. The District

counters that granting the injunction would be adverse to the public interest in

operating effective and efficient schools.

There is a strong public interest in ensuring students with disabilities receive

a meaningful education. *See McElroy v. Simon Prop. Grp., Inc.*, 2008 WL 4277716,

at *9 (D. Kan. Sept. 15, 2008) (preliminary injunction serves the public interest by

promoting goal and purpose of the ADA to provide disabled with access to public accommodations); *S.B. ex rel. M.B. v. Lee*, 566 F. Supp. 3d 835, 871 (E.D. Tenn. 2021) (preliminary injunction serves the public interest by achieving ADA's mandate to "eliminate discrimination against disabled individuals" by integrating them "into the economic and social mainstream of American life." (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)); *Jimenez ex rel. G.G. v. New Mexico Sch. For the Deaf*, 2026 WL 972864, at \*9 (D.N.M. Apr. 10, 2026) ("The public has an interest in ensuring that students with disabilities receive a meaningful education").

A preliminary injunction maintaining the status quo pending a final determination on the merits does not harm the public interest when the service has been provided without any documented detriment to the public. *Keirnan*, 339 F.3d at 1221. Although the injunction is potentially adverse to the public's interest in an effective and efficient school district, Plaintiffs presented evidence that the District and other schools have been able to operate with ABA therapy in the classrooms without issue for at least fifteen years. And E.S. and R.G. received ABA therapy in the classroom without issue for one year. Without evidence demonstrating a detriment, the District has not demonstrated that a preliminary injunction reinstating E.S. and R.G.'s therapy would be adverse to the public interest. Thus, the public interest favors granting the injunction.

### E.    Preliminary Injunction Order

The Court finds that all the elements required for a preliminary injunction have been met by Plaintiffs.

Thus, the Court grants Plaintiffs' motion for a preliminary injunction, and enjoins the District from enforcing Policy KM against E.S., R.G., and their ABA therapists. The parties will comply with the District's MOU, with the following amendments:

- The ABA therapists are allowed to provide services to E.S. and R.G. in their classrooms.

- The MOU can only be terminated for cause. The parties have a 30 day right to cure before such termination can occur.

- Background checks, confidentiality agreements, and medical tests are required to the extent that they were before Policy KM was enacted.

- The ABA therapy providers are required to carry and provide proof of liability insurance coverage at the current industry standard of $1,000,000.

### F.    Bond Order

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The court, however, has discretion to waive this requirement if there is an absence of proof showing a likelihood of harm.

-22-

-23-

*See Adams,* 919 F. Supp. at 1505 (citing *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir. 1987).

While the District has made claims of the potential hardships they will suffer regarding security, safety, finances, and liability, it has not, however, provided proof that these harms are anything more than speculative. Nor has the District provided proof that it was harmed in the past when E.S. and R.G.'s ABA therapists were in the classroom. With the absence of any proof showing harm to the District from the granting of a preliminary injunction, the Court waives the bond requirement.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 10) is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 4th day of August, 2026.

*s/Anthony J. Powell*
ANTHONY J. POWELL
UNITED STATES DISTRICT JUDGE